# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| JARROD H. LUNDVALL,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>LAND O'LAKES, INC.,<br><br>　　　　　Defendant. | No.  C18-127-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

This case is before me on a motion (Doc. No. 18) for summary judgment by defendant Land O'Lakes, Inc. (Land O'Lakes).  Plaintiff Jarrod H. Lundvall has filed a resistance (Doc. No. 23) and defendant has filed a reply (Doc. No. 25).  I find oral argument is unnecessary.  *See* Local Rule 7(c).

## II.    PROCEDURAL HISTORY

Lundvall commenced this action on August 13, 2018, by filing a petition (Doc. No. 1-1) in the Iowa District Court for Hardin County.  He filed a first amended petition (Doc. No. 4) on October 19, 2018, changing the name of the defendant.[1]  Land O'Lakes removed the case to this court based on diversity jurisdiction on November 28, 2018. *See* Doc. No. 1.

Lundvall asserts that he worked for United Suppliers, Inc., from October 9, 2016, to November 18, 2016, as a production operator at its facility in Pacific Junction, Iowa. *See* Doc. No. 4.  At the time of his discharge, he suffered from a 30 percent vision

---

[1] Land O'Lakes is the successor entity to United Suppliers, Inc., the name of the company at the time of Lundvall's hire.  *See* Doc. No. 18.

impairment.  *Id.*  He asserts that he is a qualified individual within the meaning of 42 U.S.C. § 1211(8) and that his employer perceived him to be disabled.  *Id.*  He alleges that his employer discriminated against him based on a perceived impairment by terminating his employment.  He seeks relief pursuant to the Americans With Disabilities Act (ADA), the Civil Rights Act of 1964 and the Iowa Civil Rights Act (ICRA).  *Id.* Land O'Lakes seeks summary judgment on all claims.

### III.  RELEVANT FACTS

The following facts are undisputed except where noted otherwise:

Lundvall began working at United Suppliers' agricultural chemical processing facility[2] in Pacific Junction, Iowa, in October 2016.  Doc. No. 25-1 at 1.  The facility manufactures and transports chemicals and fertilizer, including dangerous chemicals such as anhydrous ammonia.  *Id.* at 2.  Anhydrous ammonia is an odorless, colorless, invisible gas that causes suffocation.  *Id.*  The transfer of anhydrous ammonia from transport loads into storage tanks requires ongoing visual checks between the production operator/driver who opens and closes the transport valve and another employee who opens and closes the storage tank valve.  *Id.*  The facility is equipped with a wind sock on top of the storage tank so that in the event of an accident, release or emergency, employees can determine the direction of the wind and evacuate in the opposite direction.  *Id.*

In the fall of 2016, six employees worked at the facility: plant manager Tom Boehm; administrative coordinator Brandy Coates; and four production operators: Edgar "Jim" Flora, Michael Clark, Josh Bateman, and Lundvall.  *Id.* at 1.  Prior to applying for work with United Suppliers, Lundvall had been diagnosed with a hereditary, permanent vision impairment called optic nerve hypoplasia.  *Id.* at 3.  The Iowa Department of Transportation (DOT) prohibited Lundvall from operating a motor vehicle

---

[2] This facility is now owned and operated by Land O'Lakes.

when headlights were required and issued him a driver's license with that restriction on July 14, 2015. *Id.* By 2016, Lundvall's vision was impaired by 30 percent. As a military veteran, Lundvall receives Veteran's Administration disability benefits. *Id.* Lundvall does not consider himself disabled and does not believe he is disabled within the meaning of state or federal disability discrimination law. *Id.*

Lundvall applied to work as a production operator at the Pacific Junction facility on September 12, 2016. *Id.* at 4. On his application, he indicated he had never been denied a license, permit or privilege to operate a vehicle and that he had never had any license, permit or privilege suspended or revoked.[3] *Id.* He certified that all entries and information contained in the application were true and complete to the best of his knowledge and belief and were made in good faith. *Id.* at 5. He also certified that if any statement was found to be untrue or mispresented, his application could be rejected from consideration of employment opportunities or he could be dismissed in the event he was employed with United Suppliers. *Id.* It is disputed whether the employment application stated that some applicants may be required to obtain a commercial driver's license (CDL). *Id.* The job description stated: a "[v]alid state driver's license is required" and a "[w]illingness to obtain . . . CDL if necessary." *Id.* Lundvall told Coates that he could not obtain a CDL due to his vision. *Id.* at 7. He states he was told he would not need a CDL. *Id.* at 6.

Boehm interviewed Lundvall for the production operator position. *Id.* at 7. He told Lundvall that the position required performance of job duties in the early mornings and late evenings during the busy fertilizer seasons. *Id.* Boehm further informed Lundvall that the worksite would likely go into 24-hour operations in the spring and Lundvall would be on the 7:00 p.m. to 7:00 a.m. overnight shift. *Id.* at 8. During the spring season, all employees at the facility were required to work before sunrise and after

---

[3] Lundvall contends that his driving "restriction" does not constitute denial of a driving "privilege."

sunset in darkness hours. *Id*. Lundvall understood these work hours encompassed times when he was barred from driving because headlights would be required. *Id*. Lundvall told Boehm it was "fine" for him to work at night in the production operator position. *Id*. It is disputed whether he disclosed his driving restriction to Boehm. *Id*. He states that he disclosed his driving restriction to "several people" at United Suppliers, "beginning during the hiring process." Doc. No. 25-1 at 14. He also states that United Suppliers possessed documentation from the beginning of Lundvall's employment that identified his driving restriction, such as his motor vehicle record and driver's license. *Id*. He does not remember whether he otherwise disclosed the restriction to Boehm.[4] Lundvall had been driving illegally at nighttime when headlights were required despite the restriction prohibiting him from doing so. *Id*. at 9. Boehm provided Lundvall a copy of the production operator job description during the interview. *Id*. Lundvall signed an acknowledgment that he had received it. *Id*. at 9-10.

On October 11, 2016, United Suppliers hired Lundvall as an at-will employee. *Id*. at 10. He received a copy of the employee handbook providing that "[d]rivers must obey all state, federal and local traffic regulations and laws." *Id*. Lundvall knew that compliance with United Suppliers' policies was a condition of employment and knew and agreed that safety rules were important to United Suppliers. *Id*. Lundvall knew he would have to work at night but denies knowing he would have to drive when headlights were required. *Id*. at 11.

As a production operator, Lundvall was "[d]irectly responsible for the operations and maintenance of all liquid and dry fertilizer production and equipment (stationary and mobile)." *Id*. The duties of the production operator position included:

---

[4] Land O'Lakes states it is immaterial whether Lundvall casually mentioned to United Suppliers' administrative assistant that he had poor vision while filling out the employment application as it does not change the fact that he failed to disclose the impairment on his application or tell his supervisor, Boehm. *Id*. at 14-15. Land O'Lakes also notes that it obtains a driving record from the Iowa DOT at the time of hire because operating a motor vehicle is an essential function of the production operator position. Doc. No. 25-2 at 5.

- Performs all phases of liquid and dry fertilizer manufacturing, including but not limited to operating augers, conveyors, pups, mixer-blenders, load-outs, and weight scale, where applicable.

- Operates fertilizer equipment used in manufacturing processes.

- Maintains equipment and performs repairs as instructed

- Unloads railroad hoppers & tank cars; loads and unloads semi-tractor hopper & tank trailers; operates end loader, tractor, and mobile fertilizer production unit.

- Ensures quality products and inventory control within proper specifications.

- Operates and cares for instruments used in quality control.

- Other duties that may be assigned.

*Id.* at 12. The position required driving company vehicles, end loaders, tractors and mobile fertilizer production units. *Id.* Lundvall denies that he would have to operate such vehicles when headlights were required and notes the production operator job description does not indicate that driving with headlights on would be required at any time. *Id.*

The physical demands of the job included working "long or irregular hours during peak seasons . . . occasionally overnight, in order to perform all the job requirements[.]" *Id.* at 13. Lundvall denies that the description referred to overnight work. Rather, he asserts that the description referred to overnight travel. *Id.* The job description also provided that the employee would frequently be exposed to outside weather conditions and temperature differences when moving between buildings and traveling. *Id.* at 13-14. The employee would also work near moving mechanical parts and would sometimes work in high precarious places, often exposed to fumes or airborne particles and, at times, vibrations from equipment. Lundvall signed an acknowledgment of the job description,

which also stated he understood that he may be required to work overtime, different shifts or hours outside the normally defined workday or workweek. *Id.* at 13-14.

The production operator job description contains no reference to a vision requirement or standards.[5] Doc. No. 25-2 at 3. Nor does it include a requirement or otherwise provide that vehicles would have to be operated with headlights. *Id.* It does not state that employees must have a driver's license that does not restrict their ability to operate a motor vehicle when headlights are required. *Id.* Land O'Lakes states these requirements are implicit in the requirement of a valid state driver's license and willingness to work "long or irregular hours during peak seasons." *Id.* Land O'Lakes also references Lundvall's deposition in which he admitted Boehm told him the site may go into 24-hour operations in the spring and that Lundvall would be on the 7:00 p.m. to 7:00 a.m. shift, to which Lundvall responded that would be "fine." *Id.*

United Suppliers provided Lundvall with significant training regarding safety procedures. Doc. No. 25-1 at 15. He received training on hazard communication, personal protective equipment, permit required spaces, fire safety, emergency action, and working with heavy equipment. *Id.* Lundvall also received specialized training relating to safety concerns and hazards associated with anhydrous ammonia. Safety was a top priority for United Suppliers and Lundvall was trained on protecting his own safety as well as the safety of his coworkers. *Id.*

On October 26, 2016, Lundvall told his employer he needed to attend optometrist appointments because of eye injuries he sustained in the military. Doc. No. 25-2 at 3. Lundvall does not consider himself legally blind and claims to have no problems performing tasks at night. Lundvall claims he could see and work at night without issues during the time he was employed by United Suppliers and no vision restrictions or impairments prevented him from safely performing the essential functions of his job at

---

[5] Land O'Lakes notes, however, that the requirement of a "valid state driver's license" contains a vision requirement as set and enforced by the Iowa DOT. Doc. No. 25-2 at 3.

any time of day or night. Land O'Lakes denies this, noting that he lacked the ability to legally drive a motor vehicle at night, which prevented him from performing an essential function of his job. It also cites an incident in which Lundvall failed to see a visual cue made by a co-worker during the daytime. *Id.*

That incident occurred on November 3, 2016, less than three weeks after Lundvall began working at United Suppliers. Flora and Lundvall had been working together during daylight hours. Lundvall's task was to open and close a valve that controlled the release of compressed air into piping that was connected to a storage tank. Doc. No. 25-1 at 16. Flora was located approximately 100 feet away from Lundvall. *Id.* During the procedure, Flora waved his hands to indicate to Lundvall when to close the valve. Lundvall allegedly missed Flora's hand signals and Flora had to walk closer so that Lundvall could see the hand signals. Lundvall denies there was an incident when he could not see Flora's hand signals and cites his own affidavit. *Id.* at 16-17. Lundvall ultimately saw Flora's hand gesture but admits he was unaware if that was the first time Flora had signaled him. *Id.* at 16. Flora reported the incident to Boehm. Lundvall agrees that Flora would not "intentionally mislead" others regarding his belief that Lundvall did not or could not see his hand signals. *Id.* at 17-18. Lundvall also admits he might not see a hand signal such as a swipe across the neck because it is hard for him to "differentiate the different small gestures." *Id.* at 18. Lundvall was not cited for any safety violations and did not cause harm to any persons or property during this employment. Doc. No. 25-2 at 10.

Boehm reviewed the incident with management and, in that process, learned that Lundvall was prohibited from driving a motor vehicle when headlights were required. Doc. No. 25-1 at 18. Lundvall denies this, noting there was no reference to it in Boehm's February 24, 2017, affidavit submitted to the Iowa Civil Rights Commission (ICRC) or in a summary that Land O'Lakes prepared. *Id.* Land O'Lakes counters that Boehm submitted a more detailed declaration in support of the summary judgment motion and that Boehm's internal notes indicate that he had consulted with Human Resources and

United Suppliers' General Counsel, who had spoken with the CEO for United Suppliers. *Id.* at 18-19.

Lundvall states he first discussed his vision with Boehm within two weeks of starting his employment. Doc. No. 25-2 at 16. Boehm recalls the conversation but cannot remember when it occurred. *Id.* Boehm had noticed Lundvall holding his cell phone close to his face and asked Lundvall what he was doing. *Id.* at 16-17. Lundvall claims he told Boehm that he could not see well.[6] Boehm told the ICRC that Lundvall had responded that he was "looking at his phone" and Boehm "left it at that" and walked away. *Id.* at 17. Boehm stated: "I guess that's what started my concerns and thinking well maybe there is an eyesight problem . . . ." *Id.*

Boehm met with Lundvall on November 17, 2016, to discuss the safety concern from the November 3, 2016, incident as well as the additional information he had learned about Lundvall's driving restriction.[7] Doc. No. 25-1 at 19. Boehm reviewed the essential functions of the production operator job with Lundvall and reminded him that he would need to work nighttime hours during the upcoming spring fertilizer season. Boehm inquired how Lundvall intended to get to work with his driving restriction and Lundvall stated "[t]he same way I get to my night class." *Id.* Boehm understood this to mean that Lundvall would drive despite the driving restriction. Lundvall denies this was Boehm's understanding. Lundvall cites his own deposition testimony, during which he explained he purposely left his answer open-ended to see if there was a follow-up question and there was not. *Id.* at 19-20. He testified that he did, in fact, drive back and forth to his night class. *Id.* at 20. Boehm was concerned that Lundvall would ignore his driving restriction

---

[6] Land O'Lakes notes this is supported only by Lundvall's own affidavit.

[7] Lundvall notes that Boehm did not tell the ICRC that he reviewed Lundvall's situation from a safety standpoint between November 3, 2016, and November 17, 2016. Doc. No. 25-2 at 10. He also notes that Boehm did not exchange any emails or other communications with superiors concerning any safety concerns regarding Lundvall's eyesight. *Id.* Land O'Lakes denies these points create a genuine issue of material fact. *Id.*

while performing duties for United Suppliers, which would be a safety concern. *Id.* at 21. Lundvall does not dispute that Boehm's concerns with safety were sincere. On November 18, 2016, Boehm informed Lundvall his employment was being terminated. *Id.*

Land O'Lakes asserts United Suppliers discharged Lundvall because of his driving restriction, his inability to drive motor vehicles when and as needed by the essential functions of his job and the direct safety threat he posed to himself and others. *Id.* Lundvall denies this and asserts Land O'Lakes' sole reason for discharging Lundvall was his driving restriction that prevented him from driving when headlights were required. *Id.* at 22. He asserts that a summary prepared by United Suppliers indicates United Suppliers told Lundvall he was discharged because his "job required him to work after dark and since this is a problem due to his eyesight, it was considered a safety hazard to other employees." *Id.* He states the November 3, 2016, incident was not part of the reasoning.

United Suppliers did not raise a safety concern related to Lundvall's vision until the day he was fired. Doc. No. 25-2 at 11. It did not obtain any medical information regarding Lundvall's vision and did not know whether he had any medical restrictions related to his vision outside of what the Iowa DOT used to determine he was restricted from operating a motor vehicle when headlights were required. United Suppliers also did not seek to test his vision or have any discussions with Lundvall about the effect of his vision on his ability to safely perform the essential functions of his position. *Id.* at 12-13. Land O'Lakes notes that Lundvall did not request an accommodation and never sought to engage in an interactive process with United Suppliers. *Id.* at 13.

Lundvall argues that both the interior and exterior of the facility were artificially lit. United Suppliers notes that even with exterior and interior lighting, the facility was not lit in a manner that would allow the operation of motor vehicles without headlights. *Id.* United Suppliers also notes that to the extent Lundvall seeks to establish that

headlights were not necessary inside or outside of the facility, this is supported only by his self-serving affidavit. *Id.* at 14.

With regard to his ability to see hand signals, Lundvall states he could easily see hand gestures or hear verbal clues at close distances. For longer distances, Lundvall states he would ask his coworkers to use more exaggerated gestures or call his cell phone. *Id.* at 14-15. Land O'Lakes denies these were workable solutions, noting that the record lacks information about Lundvall's ability to hear oral cues in an industrial environment and cites the November 3, 2016, incident, in which Lundvall allegedly missed a co-worker's hand signal. It also notes these statements are irrelevant because Lundvall is proceeding on a perceived disability claim rather than a failure to accommodate claim. *Id.* at 15. While Lundvall denies there was an incident on November 3, 2016, in which he could not see his co-worker's hand signal, Land O'Lakes notes this does not create a genuine issue of material fact because it is supported only by Lundvall's own affidavit. *Id.* at 16.

At the time of Lundvall's discharge, United Suppliers had no openings at, or within 50 miles of, Pacific Junction, Iowa. Doc. No. 25-1 at 22. The closest opening was in Atlantic, Iowa, but Lundvall did not possess the minimum qualifications for that position (Warehouse Operations Associate). Lundvall denies that he did not possess the minimum qualifications, stating that Land O'Lakes' exhibits fail to identify the job requirements for that position. *Id.* at 22-23.

On January 10, 2017, Lundvall filed an administrative complaint with the ICRC alleging termination based only on a perceived disability of vision impairment. *Id.* at 24. In the section indicating the "action(s)" his employer took against him, Lundvall marked the box for "Termination" but not the box indicating he was "Denied Accommodation or Modification." *Id.* The narrative of his complaint indicated it was predicated entirely on a theory of regarded-as or perceived disability discrimination, not actual disability or failure to accommodate. *Id.*

## IV.    ANALYSIS

### A.    Summary Judgment Standards

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings

and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## B.    *Plaintiff's Discrimination Claim*

### 1.    *Legal Standards*

The ADA and ICRA prohibit employers from discriminating against individuals on the basis of disability.[8] 42 U.S.C. § 12112(a); Iowa Code § 216.61. A plaintiff can demonstrate discrimination through direct evidence or by raising an inference of discrimination through the *McDonnell Douglas*[9] burden-shifting framework. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). A prima facie case of

---

[8] Claims of disability discrimination under the ADA and ICRA are analyzed under the same standards. *See Gardea v. JBS USA, LLC*, 915, F.3d 537, 541 (8th Cir. 2019).

[9] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

disability discrimination requires the plaintiff to show he: (1) had a disability within the meaning of the relevant statute, (2) was qualified to perform the essential functions of his job with or without reasonable accommodation and (3) suffered an adverse employment action because of his disability. *Higgins v. Union Pacific Railroad Co.*, 931 F.3d 664, 669 (8th Cir. 2019) (citing *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996-97 (8th Cir. 2014)). Under *McDonnell Douglas*, if Lundvall is able to establish a prima facie case, the burden shifts to defendant to proffer a legitimate, nondiscriminatory reason for the adverse action. *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1044 (8th Cir. 2005). If defendant is able to show a legitimate, nondiscriminatory reason, the burden would shift back to Lundvall to show that defendant's stated reason is pretext. *Id.*

Under the ADA, a disability is defined as a physical or mental impairment that substantially limits one or more major life activities, and also includes being regarded as having such an impairment. 42 U.S.C. § 12102(2)(A) & (C). Major life activities are activities that an average person can perform with little or no difficulty such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. 29 C.F.R. § 1630.2(i). The ICRA defines disability as "the physical or mental condition of a person which constitutes a substantial disability."[10] Iowa Code § 216.2(5). The regulations for this statute provide "[t]he term 'substantially handicapped person' shall mean any person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." Iowa Admin. Code r. 161-8.26(l). A person is 'regarded as having an impairment' if he:

    a.    Has a physical or mental impairment that does not substantially limit major life activities but that is perceived as constituting such a limitation;

---

[10] The statute does not define the term "substantial disability."

b.    Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

c.    Has none of the impairments defined to be "physical or mental impairments," but is perceived as having such an impairment.

*Id.* at r. 161-8.26(5).  Seeing is a "major life activity."  *Id.* at r.161-8.26(3).  Lundvall's claims are based on a perceived or "regarded as" disability.

### 2.    *Direct or Indirect Evidence*

Lundvall argues that the *McDonnell Douglas* analysis is unnecessary because he has direct evidence that United Suppliers discharged him based on a perceived disability. He states United Suppliers identified two reasons for discharging him – his driving restriction and his alleged inability to see hand signals.  Doc. No. 23-1 at 9.  Land O'Lakes argues that Lundvall does not have any evidence that anyone at United Suppliers harbored any discriminatory animus or discharged him because of a disability.  *See* Doc. No. 25 at 2.  Regardless of whether the claims are analyzed under a direct evidence or burden-shifting approach, Land O'Lakes argues that Lundvall cannot prevail without proving he was qualified to perform the essential functions of the job and was discriminated against "because of" a disability.  *Id.* at 1.

Direct evidence is "evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated'" the adverse employment action.  *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 65-66 (8th Cir. 1997)). Direct evidence "most often comprises remarks by decisionmakers that reflect, without inference a discriminatory bias."  *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009).

While I tend to agree with Land O'Lakes that the record contains no direct evidence of discriminatory animus, I find that this issue need not be resolved because (1) Lundvall must prove the same prima facie elements under either approach and (2) Land O'Lakes seeks summary judgment based on an alleged inability to establish the second of those elements – that Lundvall is qualified to perform the essential functions of his job. If Lundvall is able to demonstrate a fact issue as to his prima facie case, I will then consider whether Land O'Lakes has a legitimate, nondiscriminatory reason and if so, whether Lundvall can demonstrate a fact issue as to whether its reason was pretext under the *McDonnell Douglas* framework.[11] *See Kratzer*, 398 F.3d at 1044-45.

### 3.     *Prima Facie Case*

Land O'Lakes argues Lundvall cannot establish a prima facie case of disability discrimination because Lundvall cannot show (a) that United Suppliers perceived him as having a physical impairment that substantially limited one or more major life activities or (b) that he was qualified to perform the essential functions of the job. As Lundvall points out, the ADA Amendments Act of 2008 (the ADAAA) changed the standard under which a person could be regarded as having an impairment. Under the ADAAA (effective January 1, 2009):

> An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*.

42 U.S.C. § 12102(3)(A) (emphasis added). Given this change, and the fact that Land O'Lakes has dropped its first argument in its reply, I will consider only whether Lundvall

---

[11] Lundvall argues the *McDonnell Douglas* test is appropriate for a third reason United Suppliers provided for terminating his employment – misrepresentations on his employment application. *See* Doc. No. 23-1 at 24.

has demonstrated a genuine issue of material fact as to whether he was qualified to perform the essential functions of the job.

### a. Is Operating a Motor Vehicle at a Time When Headlights Are Required an Essential Function of the Production Operator Position?

As noted above, to establish a prima facie case of disability discrimination, a plaintiff must show that he or she: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse employment decision because of the disability." *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012). Land O'Lakes argues Lundvall's claim fails on the second element. A person is a "qualified individual" under the ADA if he or she "satisfies the requisite skill, experience, education, and other job-related requirements, and 'can perform the essential job functions, with or without reasonable accommodation.'" *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007) (quoting *Cravens v. Blue Cross & Blue Shield of Kan. City*, 214 F.3d 1011, 1016 (8th Cir. 2000)). "Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" *Higgins*, 931 F.3d at 670 (quoting *Kammueller*, 383 F.3d at 786). The plaintiff's "specific personal experience is of no consequence in the essential functions equation." *Dropinski v. Douglas Cnty., Neb.*, 298 F.3d 704, 709 (8th Cir. 2002). The following evidence is relevant in determining whether a job duty is an essential function:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

*Id.* "[A] task may be an essential function even if the employee performs it for only a few minutes each week." *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 812 (8th Cir. 2015). *See also Dropinski*, 298 F.3d at 708-09 (noting that function may be

considered essential even though there may not be a significant amount of time performing the task routinely).

Land O'Lakes argues that operating motor vehicles and moving mechanical parts and heavy machinery at night are essential functions of the production operator role. The job description explicitly provides that employees "[m]ust be willing and able to work long or irregular hours during peak seasons . . . occasionally overnight, in order to perform all the job requirements" and must "work near moving mechanical parts; sometimes work in high precarious places[.]" Doc. No. 18-10 at 2. Land O'Lakes adds that it is undisputed that Boehm informed Lundvall during the hiring interview that the worksite would go into 24-hour operations in the spring and that Lundvall would be on the 7:00 p.m. to 7:00 a.m. overnight shift. Land O'Lakes argues that operating a motor vehicle when headlights are required is an essential function of the job and one that Lundvall lacked legal qualification for due to his restricted driver's license.[12] Doc. No. 18-1 at 12.

Lundvall disagrees that operating a motor vehicle when headlights are required constitutes an essential function of the production operator position. He states that the job description contains no reference to a vision requirement or vision standards and provides no indication that vehicles would have to be operated with headlights. He also argues there is no requirement or job function providing that employees must have a driver's license that does not restrict the ability to operate a motor vehicle when headlights are required. Doc. No. 23-1 at 12-13.

Lundvall has failed to demonstrate a genuine issue of material fact as to this issue. Lundvall's arguments are based on the absence of an explicit reference to operating a motor vehicle when headlights are required or any vision standards in the job description. The job description is one factor to consider in determining what is an essential function

---

[12] Land O'Lakes makes no argument concerning whether the ability to see hand signals from a distance constitutes an essential function of the production operator position.

and this type of exactness in the description is not required to establish an essential function. The Eighth Circuit has recognized that job functions may be deemed essential "even though they were not listed in the written job description, because they were inherently required to perform the written job functions." *Minnihan*, 779 F.3d at 812 (citing *Dropinski*, 298 F.3d at 708-09). It is undisputed that production operators may need to drive company vehicles, end loaders, tractors and mobile fertilizer production units. Doc. No. 25-1 at 12. Lundvall has also admitted that he knew he might have to work at night in the production operator position. *Id.* at 11. *See* Doc. No. 18-4 at 7 ("Q: But when you were hired, you were told there would be nighttime work; isn't that also correct. A: Yes. Q: And you accepted the job knowing there would be nighttime work; is that correct? A. Yes."). *See also* Doc. No. 25-1 at ¶ 23 (in which Lundvall admits that Boehm informed Lundvall that in the spring, the Pacific Junction worksite would likely go into 24-hour operations and Lundvall would be on the 7:00 p.m. to 7:00 a.m. shift); *Id.* ¶ 26 (in which Lundvall admits that he told Boehm that overnight work would be "fine.").

Based on these undisputed facts, the job inherently requires a production operator to operate motor vehicles at a time when headlights are required. The lack of an explicit reference to this, or to night vision requirements, in the job description is insufficient for a reasonable jury to conclude that operating motor vehicles during a time when headlights are required is not an essential function. Based on the employment application, job description, statements of the employer during the hiring interview and the nature of the job, I find that operating a motor vehicle at a time when headlights are required was an essential function of the production operator position.

### b. Was Plaintiff Qualified to Perform the Essential Functions?

Land O'Lakes contends Lundvall was not qualified to work as a production operator because: (a) he could not legally perform the essential functions of the job and (b) he was a "direct threat" to the safety of others at the facility. Land O'Lakes also

references 42 U.S.C. § 12113(a), known as the "business necessity" defense. *See* Doc. No. 18-1 at 11-15. I will first address whether Land O'Lakes can meet its burden as to the two affirmative defenses (business necessity and direct threat). *See EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) ("[T]he employer bears the burden of proof as the direct threat defense is an affirmative defense.").

The statute addressing these affirmative defenses provides:

(a) In general
It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

(b) Qualification standards
The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

42 U.S.C.A. § 12113. "Qualification standards means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). Under the business necessity defense, the employer bears the burden of showing that the qualification standard is job-related, consistent with business necessity and that performance cannot be accomplished by reasonable accommodation. *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 995 (9th Cir. 2007).

"Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r).

The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based

on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1)    The duration of the risk;
(2)    The nature and severity of the potential harm;
(3)    The likelihood that the potential harm will occur; and
(4)    The imminence of the potential harm.

*Id.* The direct threat analysis must rely on the "best current medical or other objective evidence" in order to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Wal-Mart Stores, Inc.*, 477 F.3d at 571 (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999)). The employer is required to demonstrate that it undertook an "individualized assessment of the individual's present ability to safely perform the essential functions of the job." 29 C.F.R. § 1630.2(r).

Lundvall argues that Land O'Lakes cannot establish the "business necessity" defense under 42 U.S.C. § 12113(a) because Land O'Lakes has not provided any details explaining why the ability to operate a vehicle when headlights are required is a necessary qualification for the production operator position. Doc. No. 23-1 at 17. He notes there was no such qualification listed in the job description and that when attempting to impose a safety-based blanket exclusion, the employer bears the burden of proving the nexus between the personal attribute and safe driving. *Id.* at 18 (citing *Bates*, 511 F.3d at 992). In *Bates*, the employer imposed a qualification that all package delivery drivers meet DOT hearing standards regardless of whether they were driving DOT-regulated vehicles. On remand, the district court was instructed to analyze whether the employer proved the business necessity defense by showing that the qualification standard was (1) "job-related," (2) "consistent with business necessity," and (3) that "performance cannot be accomplished by reasonable accommodation." *Id.* at 995.

Land O'Lakes' only reference to the business necessity defense is as follows:

> Operating a motor vehicle when headlights were required was an essential
> function of the production operation position, and one that Lundvall lacked
> the legal qualification for due to his restricted driver's license. *See e.g.*,
> 42 U.S.C. 12113(a) (stating that it is a "defense to a charge of
> discrimination" if an [sic] qualification standard – such as the non-restricted
> driver's license here – "screen[s] out or otherwise den[ies] a job or benefit
> to an individual with a disability" due to "business necessity").

Doc. No. 18-1 at 12. Cases applying this defense typically involve a blanket safety-based
exclusion or across-the-board requirement. *See Eggers v. Wells Fargo Bank, N.A.*, 899
F.3d 629 (8th Cir. 2018) (involving a federal statute that prohibits a person who has been
convicted of any criminal offense involving dishonesty or a breach of trust from being
employed by an institution insured by the FDIC); *Gaskin v. Science Applications Int'l,
Inc.*, Case No. CIV-18-91-R, 2019 WL 1447483, at *5 (W.D. Ok. Apr. 1, 2019)
(involving loss of an FAA certification necessary to be qualified for position as Instructor
II at the FAA Academy). The job description here lists qualifications including:
education and/or experience; language skills; mathematical skills; reasoning ability;
computer skills; certificates, licenses and registrations; other skills, abilities and
qualifications; physical demands and work environment. The physical demands and work
environment qualifications make clear that accommodations may be made for individuals
with disabilities.[13]

Under "Certificates, Licenses, Registrations" the job description states: "Valid
state driver's license is required. Willingness to obtain welding certificate and CDL if

---

[13] Under physical demands it states: "The physical demands described here are representative of
those that must be met by an employee to successfully perform the essential functions of this job.
Reasonable accommodations may be made to enable individuals with disabilities to perform the
essential functions." Doc. No. 18-10 at 2. Under work environment it states: "The work
environment characteristics described here are representative of those an employee encounters
while performing the essential functions of this job. Reasonable accommodations may be made
to enable individuals with disabilities to perform the essential functions." *Id.*

necessary." Doc. No. 18-10 at 1-2. Under "Physical Demands" it states: "Must be willing and able to work long or irregular hours during peak seasons . . . ." *Id.* To the extent that being able to operate motor vehicles at night or having an unrestricted driver's license can be considered qualification standards, they are implicit, which leads to the issue of whether this case involves a qualification standard or an essential function. As noted by Lundvall,[14] these are different standards. An essential function refers to fundamental job duties while a qualification standard refers to personal and professional attributes which an individual must meet to be eligible for a position. *See Bates*, 511 F.3d at 990. Ultimately, I find that even if this case involves a qualification standard, Land O'Lakes' cursory reference to the business necessity defense is insufficient to carry its burden in proving this defense. The issue is better addressed as whether Lundvall can perform an essential function.

With regard to the direct threat defense under 42 U.S.C. § 12113(b), "the assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). The purpose of this requirement is to "protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Nunes*, 164 F.3d at 1248. The employer's belief that a significant risk existed, even if maintained in good faith, does not relieve it from liability. *Bragdon v. Abbott*, 524 U.S. 624, 649 (1988). There is no evidence in the record that Land O'Lakes relied on any medical evidence in

---

[14] Lundvall argues that Land O'Lakes conflates the concept of an essential function of the production operator job with a qualification standard or requirement for that position. He contends a person need not meet an employer's qualification standards to be considered "qualified" because the inability to meet the qualification standards is often the basis of the discrimination challenge itself. *See* Doc. No. 23-1 at 14 (citing *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007)). Lundvall contends he need only show he is able to perform the essential functions of the job with or without a reasonable accommodation and he need not establish the ability to meet the alleged "physical requirements" of the position involving vision.

assessing any potential threat prior to terminating Lundvall's employment. Land O'Lakes has not met its burden in showing that Lundvall's employment was terminated based on an "individualized assessment" based on a "reasonable medical judgment" that he was a direct threat. 29 C.F.R. § 1630.2(r). Land O'Lakes' position is that United Suppliers terminated Lundvall's employment based on the driving restriction. Thus, the direct threat affirmative defense is inapplicable to this situation and Land O'Lakes is not entitled to summary judgment on this basis.

The remaining basis on which Land O'Lakes seeks summary judgment is whether Lundvall is otherwise considered a qualified individual. A qualified individual is a person "who, with or without reasonable accommodation, can perform the essential functions" of his or her job. 42 U.S.C. § 12111(8). It involves two inquiries: (1) whether "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires" and, (2) "without or without reasonable accommodation, can perform the essential function of such position." 29 C.F.R. § 1630.2(m). With regard to whether he could perform the essential functions of the job, Land O'Lakes argues Lundvall lacked the legal qualifications to do so based on his driver's license restriction. It also argues he could not perform the essential functions without any accommodation and, because he brings a perceived disability claim, he would not be entitled to any accommodation. It relies on Lundvall's admissions that: (1) he could not operate a motor vehicle while at work during nighttime and would have to ask another employee to do it instead and (2) he might not be able to see a hand signal as it is hard for him to "differentiate the different small gestures."[15]

Lundvall argues he was not categorically prohibited from operating motor vehicles at night as long as headlights were not required. Doc. No. 23-1 at 12-13. He contends

---

[15] Because Land O'Lakes did not argue that the ability to see small hand gestures from a distance was an essential function of the job, I do not find this admission relevant.

Land O'Lakes assumes, without support, that mechanical parts and heavy machinery constitute vehicles that would require headlight usage. *Id.* He notes he was not cited for any safety violations during his employment, did not cause any harm to property or persons and did not have any accidents or near-accidents during his employment. United Suppliers did not tell Lundvall it was concerned he could not safely work due to his vision until the day he was fired. *Id.* at 13. Lundvall claims he can "do things" at night without a problem, such as walking around his house. He contends he had no vision restrictions or impairments that prevented him from safely performing the essential functions of his job at any time of the day or night. *Id.* Land O'Lakes cites the November 3 incident as a near-accident and disagrees that Lundvall can perform work at night due to his driver's license restriction.

Land O'Lakes compares this case to *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803 (8th Cir. 2015). In that case, the plaintiff was a technical operations supervisor for a communications company. Approximately half of his working hours were spent outside of the office and involved working in the field to assist with cable and internet installations, performing quality control check and responding to customer complaints. Technical operations supervisors were provided with company vehicles. *Id.* at 807. Plaintiff experienced a seizure at work and, by law, was restricted from driving for six months. *Id.* His employer accommodated his driving restriction by reallocating those responsibilities to other employees and having plaintiff ride along with other technicians. Plaintiff then experienced another seizure, triggering a new six-month restriction. *Id.* at 807-08. The employer determined it could no longer accommodate plaintiff and gave him 14 days to apply for other positions at the company that did not require driving. Plaintiff retained counsel and went back and forth with the company to come to a resolution.

Plaintiff then experienced a third seizure at work. The employer decided to transfer plaintiff to a non-driving position in an office in a different city. Plaintiff rejected that offer because he would be unable to commute to that job based on his driving

restriction. Plaintiff's employment was ultimately terminated. *Id.* at 809. The district court found, and the Eighth Circuit agreed, that driving was an essential function of the technical operations supervisor position, that plaintiff was unable to complete this function with a reasonable accommodation and that he was not a qualified individual under the ADAAA and the ICRA. *Id.* at 812-13. The court found plaintiff failed to present a prima facie case of disability discrimination and the employer was entitled to judgment as a matter of law. *Id.* at 813.

Land O'Lakes argues Lundvall was similarly not qualified to work as a production operator because he was legally prohibited from performing the essential function of the job of operating a motor vehicle at a time when headlights were required. Because I have determined that operating a motor vehicle at a time when headlights were required was an essential function of the production operator position, Lundvall would be considered a qualified individual only if he was able to perform that function with or without reasonable accommodation. *See Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003). Lundvall suggests he could perform this function because the work site was well lit such that headlights were not required at night. Doc. No. 23-1 at 22. This subjective belief is irrelevant. *Id.*; *see also Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 371 (8th Cir. 2018) ("an employee's subjective belief that he or she can perform the essential functions of the job is irrelevant."). In *Alexander*, the plaintiff's physician had unambiguously and permanently restricted her from performing the essential function of vacuuming. *Id.* The plaintiff argued she could perform the function because she had performed the function without accommodation in the months prior to being discharged. *Id.* The court held that the employer was entitled to rely on the physician's restriction and that "the employee's belief or opinion that she can do the function is simply irrelevant." *Id.* The court stated:

> The ADA does not require an employer to permit an employee to perform
> a job function that the employee's physician has forbidden. Also irrelevant
> is the fact that the physician told Alexander, after termination, that she

could go ahead and vacuum. Northland was reasonable in relying on his earlier definitive command "No vacuuming."

*Id.*

Similarly here, United Suppliers relied on Lundvall's driving restriction imposed by the Iowa DOT. *See* Iowa Admin. Code 7610604.11(321) (outlining visual acuity and field of vision standards for licensing and the applicable restrictions). Lundvall makes no argument that he could perform the essential function of operating a motor vehicle at a time when headlights were required with a reasonable accommodation. Doc. No. 23-1 at 12-13. Indeed, there is no evidence that he requested an accommodation and, as Land O'Lakes points out, Lundvall would not be entitled to an accommodation because he alleges only a perceived disability. *See Kowitz v. Trinity Health*, 839 F.3d 742, 747 (8th Cir. 2016) ("[A]n employer's duty to accommodate an employee is not triggered until the employee clearly requests an accommodation."); *Duello v. Buchanan Cnty. Bd. of Sup'rs.*, 628 F.3d 968, 972 (8th Cir. 2010) ("Under long-held circuit precedent, 'regarded as' plaintiffs are not entitled to reasonable accommodations because the ADA was not intended to grant reasonable accommodations to those who are not actually disabled."); *Weber v. Strippit, Inc.*, 186 F.3d 907, 917 (8th Cir. 1999) ("we hold that 'regarded as' disabled plaintiffs are not entitled to reasonable accommodations . . . .").

Lundvall's driving restriction legally barred him from performing an essential function of his job. *See Minnihan*, 779 F.3d at 813 ("Iowa law made it illegal for Minnihan to drive, an essential function of his job, during the time of his restriction, and no accommodation could change that."). In the same way the ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden, *see Alexander*, 321 F.3d at 727, it also does not require the employer to allow the employee to perform a job function in violation of a legal restriction. Thus, Lundvall has failed to demonstrate a genuine issue of material fact as to whether he is qualified to perform the essential function of operating a motor vehicle at a time when headlights are required. The undisputed evidence establishes that Lundvall was legally

barred, via the restriction on his driver's license, from operating a motor vehicle at a time when headlights are required – an essential function of the production operator position. Because he has not demonstrated a genuine issue of material fact as to whether he was a qualified individual for purposes of his prima facie case, I find that Land O'Lakes is entitled to summary judgment on Lundvall's claims under the ADA and ICRA.

### 4. *Non-Discriminatory Reason*

Even if Lundvall could establish a prima facie case, Land O'Lakes argues that it had legitimate, non-discriminatory reasons for terminating his employment and that Lundvall cannot establish a genuine issue of material fact to show that its stated reasons are pretextual. Land O'Lakes cites safety concerns as well as Lundvall's failure to mention his driving restriction on his employment application or during his interview, in which he affirmatively stated to Boehm that performing the job duties during the overnight shift would be "fine."

If a plaintiff is able to establish a prima facie case of discrimination including a causal connection between an adverse employment action and the disability, the burden of production shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). "[A]n employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employment decision . . . ." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). The employer's burden at this stage is of production, not proof, and the burden "is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Floyd v. State of Mo. Dept' of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999).

Land O'Lakes has identified at least two reasons for terminating Lundvall's employment: safety concerns regarding his driving restriction and dishonesty regarding

that restriction during the hiring process. With regard to dishonesty in the hiring process, "[p]roviding false statements on an application questionnaire is a legitimate and nondiscriminatory reason for termination." *Schoonover v. Schneider Nat'l Carriers, Inc.*, 492 F. Supp. 2d 1103, 1143 (S.D. Iowa 2007) (citing cases).

Whether Lundvall actually provided false information or made misrepresentations is not the issue. The relevant issue is whether the employer reasonably believed the stated grounds at the time of the termination. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006); *EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 992 (8th Cir. 2006) (concluding whether plaintiff actually violated the company policy was not dispositive and that the "relevant question is whether the [employee] can show that [the employer] was motivated by discriminatory animus, rather than solely by its *belief* that [the employee] violated company policy.") (emphasis in original). Land O'Lakes notes that Lundvall signed an acknowledgment in his employment application that stated: "if any statement is found to be untrue or misrepresented . . . I may be dismissed in the event that I am employed with United Suppliers, Inc." Doc. No. 18-1 at 17. It notes that he failed to disclose his driving restriction on his job application and that, during the interview when Boehm informed him he may need to work the overnight shift, Lundvall stated that would be "fine." I find that Land O'Lakes' belief that Lundvall had misrepresented his driving privileges or misled Land O'Lakes into believing Lundvall had no restrictions with regard to night work constitutes a legitimate, nondiscriminatory reason for terminating Lundvall's employment.

With regard to safety concerns, Land O'Lakes states that Lundvall knew that compliance with United Suppliers' policies was a condition of employment and he agreed that safety rules were a top priority of United Suppliers. Doc. No. 18-1 at 17. It also cites its safety policy stating that "[d]rivers must obey all state, federal[,] and location traffic regulations and laws." *Id*. Land O'Lakes contends that because Lundvall had a driving restriction, he presented a safety risk. The driver's license restriction provides a legitimate, nondiscriminatory reason because it is a legal restriction by which Lundvall

(and his employer) must abide.  While the restriction raises other vision-related safety concerns, it is the driving restriction itself (based on Lundvall's vision), that formed the basis for United Suppliers' decision.  *See* Doc. No. 25 at 8-9 ("Plaintiff's lack of legal qualification was sufficient for United Suppliers to conclude that since Plaintiff could not legally perform the job, he could not safely perform it.").  I find that Land O'Lakes has met its burden of producing legitimate, non-discriminatory reasons for terminating Lundvall's employment.

### 5. *Pretext*

"To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason . . . [T]he plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010) (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008)).  "Pretext can also be demonstrated by showing that the employer shifted its explanation, that the employee received a favorable review shortly before termination or that the employer deviated from policies." *Sieden v. Chipotle Mexican Grill, Inc.*, 846 F.3d 1013, 1017 (8th Cir. 2017).  "Ultimately, the plaintiff must show that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Nelson v. USAble Mutual Ins. Co.*, 918 F.3d 990, 993 (8th Cir. 2019).

Lundvall argues he can establish pretext because United Suppliers' stated reasons for discharging him concerned his vision, which is enough to establish that prohibited reasons more likely than not motivated United Suppliers' decisionmaking.  *See* Doc. No. 23-1 at 26-27.  Lundvall argues that United Suppliers' reason of misrepresentation of information does not constitute a legitimate nondiscriminatory reason because he contends he answered all questions on the employment application truthfully.  *See* Doc. No. 23-1

at 27 ("He had a driving restriction, but that is not the same as a denial of a license, permit or privilege to operate a motor vehicle."). He also notes that this particular section of the application applied only to positions requiring a CDL.

I do not find that Lundvall has demonstrated pretext by claiming he answered all application questions truthfully. First, a plaintiff must do more than show that the employer's asserted reason was false. Second, Lundvall's argument misconstrues the relevant inquiry. *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012) ("It is not our province to determine whether the employer's investigation of alleged employee misconduct reached the correct result, so long as it truly was the reason for the plaintiff's termination."). In *Pulczinski*, the court provided the following explanation:

> If an employer, in explaining the termination, says it believed that the employee violated company rules, then proof that the employee never violated company rules does not show that the employer's explanation was false. That proof shows only that the employer's belief was mistaken. To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules.

*Id.* at 1003. Lundvall has not demonstrated a fact issue as to whether this reason was false (as opposed to mistaken) and that the true reason was discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) ("a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphases in original). The only evidence in the record, aside from Lundvall's self-serving affidavit (which is insufficient to generate a fact issue),[16] is that he told Coates he could not obtain a CDL because of his vision and

---

[16] *See Frevert v. Ford Motor Co.*, 614 F.3d 466, 473-74 (8th Cir. 2010) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." . . . "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.") (internal citations omitted).

that United Suppliers had a copy of his driver's license and motor vehicle record during his employment. This is not sufficient to demonstrate a genuine issue of material fact as there is no evidence that his supervisor, Boehm, was aware of Lundvall's driving restriction until shortly before Lundvall was discharged. *See Wierman v. Casey's General Stores*, 638 F.3d 984, 995 (8th Cir. 2011) ("To rebut the legitimate, nondiscriminatory reasons set forth by [defendant], [plaintiff] must point to 'enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove the defendant's articulated reasons for its actions.'" (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005))).

Lundvall also attempts to demonstrate pretext by contending that United Suppliers and Land O'Lakes have shifted their stated reasons for terminating his employment. He notes that United Suppliers did not identify the alleged misrepresentations in his employment application as termination grounds in earlier statements regarding Lundvall's discharge. He cites Boehm's February 24, 2017, declaration submitted to the ICRC in which he did not mention misrepresentation of qualifications as grounds for termination. *See* Doc. No. 23-4 at 31-33. Lundvall also cites Boehm's October 30, 2019, affidavit in which he identified the termination reasons related to Lundvall's driving restriction as inability to drive motor vehicles when needed and a safety threat. *See* Doc. No. 18-14. Lundvall contends the additional reason of misrepresentations during the hiring process suggests that United Suppliers' true reason for terminating Lundvall's employment is unlawful discrimination. Doc. No. 23-1 at 28.

I disagree that Land O'Lakes has shifted its reasons for terminating Lundvall's employment. Lundvall's driving restriction is at the heart of its reason. While it has also cited concerns stemming from that reason (such as safety and whether Lundvall misled United Suppliers in his employment application), Land O'Lakes has been consistent in identifying Lundvall's driving restriction as the source of these issues and any minor deviations do not undermine that reason. *See Wierman*, 638 F.3d at 996;

*Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002) (noting that where employer did not back off from the original explanation, but only pointed out additional aspects of the same behavior resulting in a slight elaboration of the original reason, there was no substantial change in reasoning that would be evidence of pretext).

Lundvall has failed to come forward with evidence to demonstrate a fact issue as to whether United Suppliers' reasons for terminating his employment were pretextual. This provides an alternative basis for granting summary judgment in favor of Land O'Lakes.

## V.    CONCLUSION

For the reasons explained herein:

1.      Defendant's motion (Doc. No. 18) for summary judgment is **granted**.

2.      This action is hereby **dismissed** and judgment **shall enter** in favor of the defendant and against the plaintiff.

3.      The trial of this case, currently scheduled to begin May 18, 2020, is hereby **canceled**.

4.      The Clerk of Court shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 18th day of February, 2020.

_____
Leonard T. Strand, Chief Judge